Dan Stormer, Esq. [S.B. #101967]
Joshua Piovia-Scott, Esq. [S.B. #222364]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Emails: dstormer@hadsellstormer.com
          jps@hadsellstormer.com

Lori Rifkin, Esq. [S.B. # 244081]
RIFKIN LAW OFFICE
P.O. Box 19169
Oakland, California 94619
Telephone: (415) 685-3591
Email: lrifkin@rifkinlawoffice.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF SANDRA VELA, deceased, by and through ANNAMARIE MORENO; ANNAMARIE MORENO; and BERNADETTE ALVERADO,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF MONTEREY; SHERIFF STEVE BERNAL, in his individual and official capacities; COMMANDER JOHN MIHU, in his individual and official capacities; COMMANDER JAMES BASS, in his individual and official capacities; SERGEANT ERIKA KAYE, in her individual capacity; SERGEANT CAROL WHITE, in her individual capacity; DEPUTY BARBARA FULKERSON, in her individual capacity; DEPUTY N. QUINTERO, in her individual capacity; FORMER SHERIFF SCOTT MILLER, in his individual capacity; CALIFORNIA FORENSIC MEDICAL GROUP; TAYLOR FITHIAN, MD; ELUID GARCIA, MD,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES:**<br>1.  Failure to Provide Medical Care (Fourteenth Amendment);<br>2.  Failure to Protect from Harm in (Fourteenth Amendment);<br>3.  Deprivation of Substantive Due Process (First and Fourteenth Amendments);<br>4.  Failure to Furnish Medical Care;<br>5.  Negligent Supervision, Training, Hiring, Retention;<br>6.  Wrongful Death;<br>7.  Negligence.<br><br>**DEMAND FOR JURY TRIAL** |

# INTRODUCTION

1.      Just after 2 a.m. on March 24, 2015, two weeks after she had been booked into Monterey County Jail ("the Jail") on a 15-year-old forgery warrant she had not known about, Sandra Vela was found hanging from a bedsheet in her cell at the Jail.  Although custody officers were required to conduct hourly "welfare and safety checks" of Ms. Vela's housing unit for the very reason of ensuring inmates' safety, Defendants' records show that Defendant Fulkerson failed to make these checks in the hours just prior to Ms. Vela's death, and, instead, falsified the safety check log to make it appear as if she had done so.  Defendants, including the County supervisory Defendants, had known for years that there was a serious problem with officers failing to conduct required safety checks at the Jail, but did not take adequate measures to remedy this problem.

2.      Ms. Vela, a 52-year-old grandmother of five had been diagnosed with a cancerous brain tumor approximately seven years before, had a shunt surgically inserted into her brain to relieve pressure from the tumor, and, as a result of the tumor, suffered chronic pain, seizures, and psychiatric symptoms including auditory hallucinations.

3.      Because of her medical conditions and symptoms, Defendant County specifically housed Ms. Vela in a single cell in a "lockdown" unit where, by policy, she was isolated in her cell for 23 hours per day.   Other inmates housed in the cells around her reported that sometime towards the end of the first week she was incarcerated, Ms. Vela became obviously distraught and delusional, and was continually yelling and screaming.  She grew increasingly despondent, telling her daughter, Plaintiff AnnaMarie Moreno she did not think she could make it.

4.      Despite Ms. Vela's pleas for help, Defendants failed to provide her appropriate care.  She never received her pain medications or other medications necessary to manage her brain cancer. On March 20, 2015, a Friday, she was placed in a safety cell on suicide watch, but Defendant Fithian discharged her after just one

hour and she was subsequently transferred back to the single-cell lockdown housing with known suicide hazards including potential ligature attachment points, and full property, including bedsheets.  Defendants returned Ms. Vela directly from suicide watch to this housing despite knowing that there were no mental health staff at the Jail on weekends who would see Ms. Vela. in the following days. Monterey County Sheriff's officers, including Defendant Fulkerson, failed to carry out even the minimal hourly safety and welfare checks required by Jail policy on Ms. Vela's unit in the hours leading up to her death.

5.     Deadly consequences resulting from failure to provide basic care and protection to people entrusted to their care were nothing new to Defendants in March 2015, when Ms. Vela tragically died.  A federal class action lawsuit had been filed in May 2013 against the County of Monterey and the for-profit health provider, California Forensic Medical Group ("CFMG"), with whom the County contracted to provide health care in the Jail.  This lawsuit alleged systemic failures in their provision of medical and mental health treatment at the Jail, and expert consultant and Grand Jury reports in 2014 and 2015 confirmed these failings. County Defendants at the highest levels, including Defendants Sheriff Bernal and Commanders Mihu and Bass, were well aware that custody officers at the Jail routinely did not complete the required hourly safety checks of housing units and falsified safety check logs. Yet Defendants stubbornly refused to take necessary actions to remediate these known deficiencies in the Jail.  As a result, Ms. Vela was the third person to die in the Jail in the first three months of 2015, and the second person in that time to commit suicide by hanging in a cell with well-known suicide hazards.

## JURISDICTION

6.     This Complaint seeks damages for violations of the civil rights, privileges, and immunities guaranteed by the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, and for

violations of California state law.

7.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1376, because the claims form part of the same case or controversy arising under the United States Constitution and federal law.

**VENUE**

9.      Plaintiffs' claims arose in the County of Monterey, California. Venue therefore lies in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

10.     Rule 3 of the Federal Rules of Civil Procedure and Local Rule 3-2(e) authorize assignment to this division because a substantial part of the events of omissions giving rise to Plaintiffs' claims occurred in Monterey County, which is served by this division.

**PARTIES**

11.     Plaintiff ESTATE OF SANDRA VELA brings this action by and through ANNAMARIE MORENO pursuant to California Code of Civil Procedure § 377.60.  Sandra Vela died after hanging herself with a bedsheet in a lockdown cell in Monterey County Jail in Salinas, California on March 24, 2015.  Plaintiff ESTATE brings claims based on violations of the Fourteenth Amendment and California state laws.

12.     Ms. Vela was a 52-year-old grandmother of five, and had been booked into the Jail on a 15-year-old warrant for forgery and embezzlement.  The outstanding warrant was unknown to Ms. Vela.  Ms. Vela had been diagnosed as having a cancerous brain tumor sometime in or around 2008 and, in 2015, was receiving treatment from doctors in Santa Barbara and Salinas.  Doctors had surgically implanted one or more shunts into her brain to relieve some of the

pressure of the brain tumor.  As a result of the tumor, she experienced chronic pain, seizures, and auditory hallucinations.  She was also diabetic and suffered from depression.  Despite her health challenges, Ms. Vela had close and active relationships with her mother, daughters, and grandchildren.  Ms. Vela primarily lived with her mother in Santa Paula near to her daughters and grandchildren, whom she saw frequently.

13.     Plaintiff ANNAMARIE MORENO is Sandra Vela's oldest daughter and resides in Santa Paula, California. Ms. Moreno is 37 years old, and the mother of one of Ms. Vela's grandchildren.  She is suing individually for violations of civil rights under the First and Fourteenth Amendments and California state law.

14.     PLAINTIFF BERNADETTE ALVERADO is Sandra Vela's younger daughter and resides in Santa Paula, California.  Ms. Alverado is 34 years old, and the mother of four of Ms. Vela's grandchildren. She is suing individually for violations of civil rights under the First and Fourteenth Amendments and California state law.

15.     Defendant COUNTY OF MONTEREY is a public entity, duly organized and existing under the laws of the State of California. Under its authority, and through the Monterey County Sheriff's Office ("MCSO), Defendant County of Monterey operates and manages Monterey County Jail and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of MCSO and its respective employees and/or agents. COUNTY OF MONTEREY, through MCSO, is and was responsible for ensuring the safety of all persons incarcerated in the Jail and providing them appropriate medical and mental health treatment.

16.     Defendant STEVE BERNAL is and, since December 31, 2014, has been the Sheriff-Coroner of the County of Monterey, the highest position in MCSO. As Sheriff, Defendant Bernal is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all MCSO

employees and/or agents.  Defendant Bernal is and was charged by law with oversight and administration of the Monterey County Jail, including ensuring the safety of the inmates housed therein. Defendant Bernal also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the MCSO alleged herein were committed. Defendant Bernal is being sued in his individual and official capacities.

17.     Defendant SCOTT MILLER is the former Sheriff-Coroner of the County of Monterey, the highest position in MCSO.  Miller was Sheriff-Coroner from January 2011 through December 30, 2014. As Sheriff, Defendant Miller was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all MCSO employees and/or agents.  Defendant Miller was charged by law with oversight and administration of the Monterey County Jail, including ensuring the safety of the inmates housed therein. Defendant Miller was responsible for many of the acts and/or omissions with respect to promulgation of policies and procedures, and allowance of the practices/customs pursuant to which the acts of the MCSO alleged herein were committed. Specifically, Defendant Miller was well aware of the deficiencies welfare and safety checks at the Jail, the suicide risks and hazards at the Jail, the high death rate at the Jail resulting from failure to provide adequate health treatment, but failed to take reasonable steps in the months and years prior to Ms. Vela's death to address the substantial risks of serious harm that these created.  Defendant Miller is being sued in his individual capacity.

18.     Defendant JOHN MIHU is and was at all times relevant herein a Commander in MCSO, one of the highest-level supervisory positions.  In March 2015, Mihu was the Jails Operations Commander, and was primarily responsible for assisting the Sheriff-Coroner with oversight and administration of the Jail, including ensuring the safety of the inmates housed therein.  As Jails Operations Commander, Mihu was responsible for supervision of MCSO employees and/or

agents at the Jail, and for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the MCSO alleged herein were committed. Defendant Mihu also directly supervised Defendant Sergeants Kaye and White.  Defendant Mihu is being sued in his individual and official capacities.

19.     Defendant JAMES BASS is and was at all times relevant herein a Commander in MCSO, one of the highest-level supervisory positions.  In March 2015, Bass's responsibilities at the Jail included medical liaison, overseeing the classification unit, and compliance.  As Commander, Bass was responsible for assisting the Sheriff-Coroner with oversight and administration of the Jail, including ensuring the safety of the inmates housed therein.  In March 2015, Bass was specifically responsible for working with CFMG, and working on issues related to the class action lawsuit against the Jail for, *inter alia*, failure to provide adequate medical and mental health treatment to inmates.  Bass was and is responsible for supervision of MCSO employees and/or agents at the Jail, and for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the MCSO alleged herein were committed. Defendant Bass also directly supervised Defendant Sergeants Kaye and White.  Defendant Bass is being sued in his individual and official capacities.

20.     Defendants ERIKA KAYE and CAROL WHITE are, and were at all relevant times mentioned herein, Jail Sergeants in MCSO.  As Sergeants, Kaye and White are supervisors at the Monterey County Jail, are responsible for ensuring the safety of the inmates housed therein, and supervise all of the deputies that are on duty during their shifts. Kaye and White were shift supervisors on the night of March 23 and morning of March 24, 2015, when Ms. Vela died.  Defendants Kaye and White are being sued in their individual capacities.

21.     Defendant BARBARA FULKERSON and N. QUINTERO are, and were at all relevant times mentioned herein, MCSO Deputies.  Fulkerson and

Quintero were assigned to work at Monterey County Jail, and were responsible for carrying out MCSO policies and procedures and for ensuring the safety of inmates at the Jail.  Fulkerson and Quintero were assigned to work floor deputies for the women's section of the Jail on the night of March 23 and the morning of March 24, 2015, when Ms. Vela died.  Defendants Fulkerson and Quintero are being sued in their individual capacities

22.    Defendant CALIFORNIA FORENSIC MEDICAL GROUP ("CFMG") is a California corporation headquartered in Monterey, California. CFMG is a private for-profit correctional health care provider that services approximately 65 correctional facilities in 27 California counties. The County of Monterey contracts with CFMG to provide medical, mental health, and dental services for the Monterey County Jail. At all relevant times mentioned herein, CFMG was responsible for the provision of health services to Sandra Vela during her detention in the Monterey County Jail.

23.    Defendant TAYLOR FITHIAN, M.D., is, and was at all relevant times mentioned herein, the co-founder and President for Defendant CFMG.  Fithian was previously the Medical Director for CFMG and is now the Chief Psychiatrist for Mental Health Services for CFMG.  Fithian is also the psychiatrist at Monterey County Jail, providing psychiatric services at the Jail, and overseeing provision of mental health by other CFMG staff at the Jail.  The Medical Director at the jail also reports to Fithian.  Fithian is and was responsible for promulgation of policies and procedures and allowance of the practices/customs pursuant to which the acts of CFMG alleged herein were committed. In addition, on information and belief, Fithian released Sandra Vela from suicide watch on March 20, 2015.

24.    Defendant ELUID GARCIA, M.D., is, and was at all relevant times mentioned herein, CFMG's on-site medical director for Monterey County Jail. Garcia is responsible for the day-to-day provision of medical, mental health, and dental care at the Jail.  Garcia is also responsible for policies, procedures, and

practices regarding provision of health care at the Jail, and is responsible for training and supervision of CFMG medical staff servicing the Jail.

25.     At all times relevant herein, Defendants engaged in the acts or omissions alleged herein under color of state law.

## EXHUASTION OF PRE-LAWSUIT PROCEDURES
## FOR STATE LAW CLAIMS

26.     Plaintiffs filed governmental tort claims with Defendant County of Monterey on behalf of the Estate of Sandra Vela, AnnaMarie Moreno, and Bernadette Alverado on September 16, 2015.  By correspondence dated November 2, 2015, the County of Monterey rejected these claims.

## FACTUAL ALLEGATIONS

### I.     Sandra Vela's Death

27.     On March 11, 2015, MCSO officers arrested Sandra Vela on an outstanding 15-year-old warrant for forgery and embezzlement. On information and belief, Ms. Vela was not the subject of surveillance or any active pursuit of the warrant, but, instead, was simply present at a location where officers responded to a call. On information and belief, upon running Ms. Vela's identification, they became aware of an outstanding warrant for forgery and embezzlement from the year 2000.  Thereafter, they arrested Ms. Vela and transported her to the Jail.

28.     Ms. Vela was brought to the Jail at approximately 6:57 p.m. on March 11, and was processed through booking at approximately 2:43 a.m. on March 12.

29.     Ms. Vela informed intake staff at the Jail that she was under a doctor's care for her medical conditions.  On information and belief, Ms. Vela repeatedly told Jail staff that she needed medical treatment for the brain tumor and related symptoms, including chronic pain, and for diabetes.

30.     Because of her medical conditions and symptoms, Defendants, in accordance with County procedure and practice, specifically housed Ms. Vela in the R-pod at the Jail, which is the Jail's "lockdown" unit for female inmates.  R-pod

consists of single cells and, by policy, inmates housed in the lockdown unit are isolated in their cells for 23 hours per day.

31.     Pursuant to County policy and procedure for the Jail's lockdown units, other than court or medical appointments, the only out-of-cell hour allotted per day is for dayroom or showers, and there is a rotation so each inmate has this hour out alone.

32.     During Ms. Vela's incarceration at the Jail, she required significant medical and mental health treatment for brain cancer and related conditions, as well as diabetes. On information and belief, Defendants failed to provide such treatment to Ms. Vela.

33.     Ms. Vela made numerous requests to staff of Defendants County of Monterey and CFMG for medical and mental health care. During their almost-daily phone conversations during Ms. Vela's incarceration, Ms. Vela repeatedly told her daughter, Ms. Moreno, that she was not receiving her medications and other necessary health care. Ms. Vela reported that she did not see a doctor, and saw a nurse practitioner only once.

34.     Ms. Moreno contacted the Jail on her mother's behalf, and was connected with staff whom she was informed were medical personnel. She told them that her mother needed urgent medical attention.

35.     On information and belief, rather than the pain medication Ms. Vela required to manage her chronic pain, she was provided only Tylenol at the Jail.

36.     Other inmates housed on the R-pod observed that Ms. Vela had seemed to be "normal" when she was brought into the Jail, but became delusional towards the end of her first week of incarceration. From that point on, she was often yelling or screaming what appeared to be delusional statements about other inmates or a sheriff having killed her husband and stolen her cell phone and credit cards. She appeared to believe that other inmates had keys to her cell and begged them to let her out of the Jail. She could also be heard crying in her sleep and

saying that she needed to see her dead husband.

37.     Ms. Vela told another inmate in R-pod that she wanted God to take her already because she was in pain.  At times, she refused to eat.

38.     On March 20, 2015, at approximately 10:00 a.m., custody officers placed Ms. Vela on suicide watch in a safety cell at the Jail.  However, just one hour later, on information and belief, Defendant Fithian ordered Ms. Vela discharged from suicide watch.  At approximately 2:10 p.m., she was transferred back to a lockdown cell on R-unit with full property, including bedsheets.  The cell had potential hanging attachment points that were known to Defendants, including a bunk bed with railings.

39.     March 20, 2015, the date Ms. Vela was placed on and discharged from suicide watch was a Friday.  By policy and procedure, County and CFMG Defendants did not schedule any mental health staff at the Jail on the weekends.  On information and belief, this means that, in the days following Ms. Vela's discharge from suicide watch, she did not see any mental health clinicians.

40.     On March 24, 2015, at approximately 2:04 a.m., Defendant Deputy Quintero, who was working as one of the floor deputies in the women's section of the Jail, was conducting a welfare and safety check of R-pod, and, as Quintero walked past Ms. Vela's cell, he saw her in a semi-seated position against her bunk with her eyes closed, face very pale, and lips dark blue.  A bedsheet was wrapped around her neck and the other end of the bedsheet was tied to the upper railing of the bunk bed in the cell.

41.     After finding Ms. Vela, Defendant Quintero went to the "pod box" on the first tier of R-unit in order to unsecure the cell door to Ms. Vela's cell.  Then Quintero returned to the cell where, instead of immediately cutting or otherwise removing the noose from Ms. Vela's throat, Quintero yelled three times to determine her responsiveness.  Only after Ms. Vela did not respond to Quintero's yells did Quintero attempt to untie the bedsheet around Ms. Vela's neck. However,

Quintero was not able to do this, and so then untied the bedsheet from around the railing. Quintero then dragged Ms. Vela outside the cell and then began to perform CPR and alerted medical staff to respond to R pod.

42.     Per policy and procedure, despite a known history of suicides and suicide attempts by hanging at the Jail, MCSO does not equip its deputies with cut-down tools that can be readily used to sever a noose around an inmate's neck. Rather, sometimes more senior officers will give cut-down tools to newer officers as "Christmas gifts."

43.     On information and belief, Deputy Quintero did not have a cut-down tool that would have made it easier and faster to remove the noose from Ms. Vela's throat.

44.     Sometime after Quintero began CPR, Defendant Fulkerson arrived and began to help Quintero perform CPR until a nurse arrived.

45.     Outside emergency responders then arrived at the scene, and emergency medical personnel pronounced Ms. Vela dead at 2:28 a.m.

46.     A note was found in Ms. Vela's cell that read:  "At his or her convenience, I would like to talk to the person in charge.  As a inmate I have been TR (illegible) very bad.  I will be writing a letter to the California regard this facility.  We are people just like you and does not change (illegible) I am in here a 15yr case that I did not do and very sick with cancer and is not getting my medication as needed (illegible)."[1]

47.     Defendant Deputy Fulkerson was also assigned to work as one of the floor deputies for the women's section of the Jail on the night of March 23 and the morning of March 24.  Fulkerson initialed the welfare and safety check log for R-pod for a 1:06 a.m. check.  However, Fulkerson never went into the unit to actually conduct this check.

48.     At the time Defendant Quintero found Ms. Vela, Defendant Fulkerson

_____

[1] This is Defendants' transcription of the note.

COMPLAINT FOR DAMAGES          -11-

was in the front lobby of the main jail with Defendant Sergeant Kaye.  When they heard the radio call for medical staff to respond to R-pod, they went to R-pod.

49.     Although a Sergeant is supposed to supervise to ensure that deputies are adequately conducting welfare and safety checks, and are supposed to sign off on the safety check log, there were no Sergeant's initials on the log the morning that Ms. Vela hung herself.

50.     On March 24, 2015, after Ms. Vela's death, Defendants Commander Mihu and Sergeant White were informed by control room staff that Deputy Fulkerson had never conducted the 1:00 a.m. welfare and safety check for R-pod. Rather, the only time control room staff had opened the door around 1:00 a.m. was for the medical deputy who was escorting medical staff to provide medication.

51.     Despite having been informed that Fulkerson falsified the welfare and safety check log and failed to conduct the 1:00 a.m. check, Defendant Sergeant White stated in an email to Defendants Bernal, Bass, and Mihu relating the events of March 24, 2015 that Defendants Quintero and Fulkerson deserved "major kudos" for their actions with regard to Ms. Vela.

II.     **Defendants' Knowledge that Provision of Medical and Mental Health Treatment at the Jail, Including Suicide Prevention Procedures, Was Inadequate and the Lockdown Cell Where they Housed Ms. Vela After Releasing Her from Suicide Watch Was Unsafe**

52.     County and CFMG Defendants were well aware that the lockdown cell where Ms. Vela was housed on March 24, 2015 contained suicide hazards and was unreasonably dangerous for housing inmates with identified mental health concerns.

53.     County and CFMG Defendants had also been on notice for years that their provision of medical and mental health treatment to inmates at the Jail was inadequate and resulted in needless harm and death.

54.     There was a substantial history of prior suicides and suicide attempts at

the Jail in which inmates attached bedsheets or other materials to hanging points in the lockdown cells.  These included successful suicides by hanging in lockdown cells in 2010, 2011, 2013, and February 2015, just one month prior to Ms. Vela's death.  Additionally, there had been numerous attempted suicides by hanging in lockdown cells in the months and years prior to Ms. Vela's death, including in the women's lockdown pod(s).

55.     A December 30, 2011 Jail Needs Assessment commissioned by Defendant County found a number of problems with respect to protecting inmates from harm at the Jail, including:  "suicide hazard elimination is not as stringent as it should be to prevent self-harm and the attendant liability;" a "glaring example of the physical plan limitations in the existing jail is the design of the control or 'guard' station, and the ability of staff to directly supervise inmates.  At best there is intermittent observation of the inmates;" and the operation of the Jail as an "indirect supervision jail" makes mental health issues "considerably more difficult to recognize, manage, and treat."

56.     The 2011 Needs Assessment also found that Defendants' policies and procedures for screening, supervising, and treating inmates at risk for suicide were inadequate, and that chronic understaffing of the jail hindered the ability of Defendants to provide adequate medical care and maintain inmate safety and security.

57.     On May 23, 2013, a federal class action lawsuit was filed against Defendants County and CFMG alleging that these Defendants were deliberately indifferent to the medical and mental health needs of inmates housed at the Jail, resulting in grievous and unnecessary suffering, harm, and death.

58.     In 2013, experts jointly retained by Defendants County, CFMG, and plaintiffs in the class action lawsuit to evaluate the Jail identified a variety of deficiencies in the provision of medical and mental health care at the Jail and the presence of hazards including the conditions in the lockdown units that put inmates

COMPLAINT FOR DAMAGES                    -13-

at unacceptable risk of suicide and self-harm. These experts also concluded that the failure to have mental health staff at the Jail on weekends resulted in Defendants' inability to provide minimally adequate care.

59.     Despite these known suicide hazards and deficiencies in monitoring inmates in the lockdown units, at the time Ms. Vela was in the Jail, Defendant County had a policy, procedure, and/or practice of housing inmates with identified mental health concerns specifically in isolation in these lockdown cells.

60.     Approximately one month after Ms. Vela's death, a federal court issued a preliminary injunction in the class action lawsuit that had been filed in 2013 against Monterey County and CFMG ordering them to "remove all hanging points and other hazards in the jail's administrative segregation units that pose a risk of being used by inmates to harm themselves or attempt suicide."  The court found that "[d]espite four suicides in administrative segregation, Defendants continue to place clinically unstable mentally ill patients in segregation and fail to eliminate potential suicide hazards."  The court further found that there was "significant evidence that Defendants' policies and practices constitute deliberate indifference to Plaintiffs' serious medical needs, particularly for the mentally ill."

61.     Specifically with regard to Defendant County's policies and procedures for inmates in administrative segregation (lockdown) housing, the court found that the County failed to "engage in practices—conducting pre-segregation screening, providing adequate structure and unstructured out-of-cell time, utilizing a suicide assessment tool—known to reduce the risk created by administrative segregation."  The court also found that the County's policy regarding health and safety checks in administrative segregation units did not meet correctional standards to prevent suicides and placed all inmates, especially those with serious mental illness, at risk of serious harm.

/ / /

/ / /

III.     **Defendants' Knowledge That Custody Officers Regularly Failed to Conduct Required Hourly Safety Checks and Failure to Take Adequate Measures to Remediate This Failure**

62.     Welfare and safety checks by custody staff, when done correctly, are an important part of protecting inmates in the Jail from harm, including preventing suicide.

63.     Well in advance of Ms. Vela's death, Defendants were aware that there was a problem with custody officers failing to actually perform required welfare and safety checks in the housing units at the Jail.

64.     Former Sheriff Miller has testified that he became aware of systemic problems with welfare and safety checks as early as 2011, including regular failure by deputies to conduct checks and inaccurate logging of checks.

65.     In 2014, because of continuing inadequacies in the performance of the welfare and safety checks, the County specifically assigned a Sergeant at the Jail to do a daily review of checks every day, purportedly to ensure that custody officers would actually perform them.  However, during this monitoring, the Sergeant reported ongoing, frequent, and repeated problems with custody officers actually performing these checks.  The Sergeant notified MCSO supervisors of these ongoing problems, including Defendants Mihu and Bass.

66.     A 2015 Grand Jury Report on the Jail found that welfare and safety checks were still not being conducted correctly.  The Report concluded, "Another problem the MCCGJ discovered was that some logs are incorrectly or falsely filled out, with checks being claimed when they were not actually done."  The Report stated that audits of the Jail from the first quarter of 2015 (which included the period of Ms. Vela's incarceration) reviewed by the Grand Jury showed that safety checks were "frequently missed or skipped, or not adequately documented." The Report noted that in January 2015, full compliance with the required checks "was achieved on only eight days."

COMPLAINT FOR DAMAGES                    -15-

67.     Despite all of this information and evidence that welfare and safety checks were not being done as required, and that failure to conduct these checks created substantial risk of harm to inmates, County Defendants failed to take adequate steps to remediate the problem.

68.     Had Defendant Fulkerson conducted the required check during the 1:00 a.m. hour on the March 2015, it is likely that Ms. Vela's death would have been prevented.  Yet, even after County supervisory Defendants were informed that Fulkerson failed to conduct this check and falsified the safety logs, they ratified Fulkerson's actions, stating she deserved "kudos."

69.     Defendants failed to provide Ms. Vela necessary medical and mental health treatment, increasing her pain and mental health symptoms; specifically housed her in isolation in a cell with known suicide hazards despite obvious symptoms of suicidality; and failed to ensure that basic procedures required of correctional facilities to protect inmates from harm were followed.

70.     These actions and omissions by Defendants directly placed Ms. Vela at substantial risk of the grievous and tragic harm that ultimately occurred.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Deliberate Indifference to Serious Medical and Mental Health Needs in Violation of the Fourteenth Amendment to the Constitution of the United States (Survival Action – 42 U.S.C. § 1983)**

**(Against ALL Defendants)**

71.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 70 as though fully set forth herein.

72.     County and CFMG Defendants have inadequate policies, procedures, and practices to ensure provision of minimally adequate medical and mental health treatment to inmates housed at the Jail.

73.     County Defendants also failed to adequately supervise the provision of

1   medical and mental health services at the Jail, violating their constitutional

2   obligation to ensure that inmates entrusted to their care receive necessary treatment.

3       74.     County Defendants also failed to properly train and supervise custody

4   staff regarding policies, procedures, and practices that are necessary for the

5   provision of adequate medical and mental health care, including conducting welfare

6   and safety checks and responding to medical emergencies.

7       75.     CFMG Defendants failed to promulgate and implement policies,

8   procedures, and practices to ensure that medical staff, including mental health staff,

9   met the standard of care when providing treatment to inmates.

10      76.     County and CFMG Defendants were on notice for years prior to the

11  death of Sandra Vela that their provision of medical and mental health care was

12  woefully inadequate and fell far short of the minimum elements of a constitutional

13  health care system. County and CFMG Defendants were on notice that their

14  policies, procedures, and practices resulted in failure to provide necessary medical

15  and mental health care to the inmates at the Jail, and that this failure may result in

16  otherwise preventable death.

17      77.     Defendants' failure to correct their policies, procedures, and practices

18  despite notice of significant and dangerous problems evidences deliberate

19  indifference to the inmates in their care.

20      78.     Ms. Vela's medical and mental health needs were known to

21  Defendants throughout the brief period of her incarceration at the Jail.  Despite this

22  knowledge, and Ms. Vela's obvious signs of psychological and emotional distress,

23  Defendants failed to provide necessary medical and mental health evaluation and

24  treatment to Sandra Vela while she was held at the Jail.

25      79.     Defendant Fithian discharged Ms. Vela from suicide watch after only

26  one hour just days prior to her suicide without performing an assessment of her

27  suicide risk that met the standard of care.

28      80.     Defendants' actions and/or omissions as alleged herein, including but

COMPLAINT FOR DAMAGES          -17-

not limited to their failure to provide Sandra Vela with appropriate medical and psychiatric care and to identify suicide risk, along with the acts and/or omissions of Defendants in failing to train, supervise, and/or promulgate appropriate policies and procedures to identify suicide risk and provide medical and psychiatric treatment, constituted deliberate indifference to Ms. Vela's serious medical needs, health, and safety.

81.     As a direct and proximate result of Defendants' conduct, Sandra Vela experienced physical pain, severe emotional distress, and mental anguish over a period of thirteen days, as well as loss of her life and other damages alleged herein.

82.     The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive.  As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## SECOND CLAIM FOR RELIEF

**Failure to Protect from Harm in Violation of the Fourteenth Amendment to the Constitution of the United States**

**(Survival Action – 42 U.S.C. § 1983)**

**(Against ALL Defendants)**

83.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 as though fully set forth herein.

84.     County and CFMG Defendants were on notice that their deficient policies, procedures, and practices alleged herein created substantial risk of serious harm, including self-inflicted harm, to an inmate in Ms. Vela's position.

85.     Each Defendant could have taken action to prevent unnecessary harm to Sandra Vela but refused or failed to do so.

86.     By policy, procedure, and practice, County and CFMG Defendants specifically housed Ms. Vela in isolation with full property in a cell in the

lockdown unit at the Jail that contained known suicide hazards. Defendants failed to take any reasonable steps to mitigate the obvious and well-known risk of harm, including self-inflicted harm, that was attendant to housing Ms. Vela in this setting.

87.     County supervisory Defendants including Bernal, Miller, Mihu, Bass, Kaye, and White also knew that deputies routinely failed to conduct required welfare and safety checks in the lockdown units and failed to take sufficient actions to correct this problem and ensure that necessary checks were performed.

88.     By policy, procedure, and/or practice, County supervisory Defendants also failed to provide appropriate equipment to their deputies, including a cut-down tool, given the substantial history of suicides and suicide attempts by hanging at the Jail and the identified suicide hazards in the Jail including cells with identified ligature attachment points.

89.     County and CFMG Defendants were on notice that their policies, procedures, and practices for monitoring inmates in the lockdown units at the Jail were inadequate and gave rise to a substantial risk of serious harm.

90.     Defendants failed to properly train and supervise staff regarding policies, procedures, and practices necessary for the protection of inmates from harm, including self-inflicted harm.

91.     Defendants' failure to correct their policies, procedures, and practices despite notice of significant and dangerous problems evidences deliberate indifference to the inmates in their care.

92.     Defendant Fithian's discharge of Ms. Vela from suicide watch in safety cell directly back to a cell in the lockdown unit with known suicide hazards, without adequate suicide prevention precautions and knowing that mental health clinicians were not at the Jail on weekends, directly placed Ms. Vela at substantial risk of serious harm, including suicide.

93.     Defendant Fulkerson's failure to conduct the required safety check of Ms. Vela's housing unit on the date of her death, and falsification of the safety

check log evidences deliberate indifference to the risk of harm to Ms. Vela.

94.     Defendant Quintero's failure to provide immediate assistance to Ms. Vela including immediately entering Ms. Vela's cell and cutting the ligature off her neck evidences deliberate indifference to the risk of harm to Ms. Vela.

95.     Defendants White, Mihu, Bass, and Bernal ratified Fulkerson's failure to conduct safety checks and falsification of logs, and Quintero's failure to immediately render necessary emergency assistance to Vela.

96.     As a direct and proximate result of Defendants' conduct, Sandra Vela experienced physical pain, severe emotional distress, and mental anguish over a period of thirteen days, as well as loss of her life and other damages alleged herein.

97.     The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive.  As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## THIRD CLAIM FOR RELIEF

**Deprivation of Substantive Due Process Rights in Violation of First and Fourteenth Amendments to the Constitution of the United States – Loss of Parent/Child Relationship (42 U.S.C. § 1983)**

**(Against ALL Defendants)**

98.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 97 as though fully set forth herein.

99.     The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Sandra Vela's serious medical needs, health, and safety, violating Sandra Vela's constitutional rights, and their failure to train, supervise, and/or take other appropriate measures to prevent the acts and/or omissions that caused the untimely and wrongful death of Sandra Vela deprived Plaintiffs Moreno and Alverado of their liberty interests in the parent-child relationship in violation of

1  their substantive due process rights as defined by the First and Fourteenth

2  Amendments of the Constitution.

3      100.     As a direct and proximate result of the aforementioned acts and/or

4  omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein.

5      101.     The aforementioned acts of individual Defendants were conducted

6  with conscious disregard for the safety of Plaintiff and others, and were therefore

7  malicious, wanton, and oppressive.  As a result, Defendants' actions justify an

8  award of exemplary and punitive damages to punish the wrongful conduct alleged

9  herein and to deter such conduct in the future.

10               **FOURTH CLAIM FOR RELIEF**

11          **Failure to Furnish / Summon Medical Care**

12          **(Survival Action – California State Law)**

13   **(Against Defendants County of Monterey, Fulkerson, and Quintero)**

14      102.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through

15  101 as though fully set forth herein.

16      103.     Defendants owed Sandra Vela a duty of care to provide her immediate

17  medical care.

18      104.     The conduct of Defendants alleged herein, including but not limited to

19  the facts that Defendants knew or had reason to know that Sandra Vela was in need

20  of immediate medical attention on March 24, 2015 and Defendants failed to take

21  reasonable actions to summon or provide that care, resulting in Sandra Vela's death

22  as alleged herein, violated California state law, including Cal. Govt. Code §§ 844.6

23  and 845.6.

24      105.     The alleged conduct of Defendants was committed within the course

25  and scope of their employment.

26      106.     As a direct and proximate result of Defendants' breach, Sandra Vela

27  suffered injuries and damages causing great pain and leading to her death, as

28  alleged herein.

COMPLAINT FOR DAMAGES            -21-

107.     The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive.  As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## FIFTH CLAIM FOR RELIEF

### Negligent Supervision, Training, Hiring, and Retention

### (Survival Action – California State Law)

### (Against Defendants County of Monterey, Steve Bernal, John Mihu, James Bass, Erika Kaye, Carol White, California Forensic Medical Group, Taylor Fithian, and Eluid Garcia,)

108.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 107, as though fully set forth herein.

109.     Defendants had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or agents refrained from the conduct and/or omissions alleged herein.

110.     Defendants breached this duty, causing the conduct alleged herein. Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of California.

111.     As a direct and proximate result of Defendants' failure, Plaintiffs suffered injuries and damages as alleged herein.

## SIXTH CLAIM FOR RELIEF

### Wrongful Death – California Code Civ. Proc. § 377.60

### (Against ALL Defendants)

112.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 111 as though fully set forth herein.

113.     Sandra Vela's death was a direct and proximate result of the aforementioned wrongful and/or negligent acts and/or omissions of Defendants.

Defendants' acts and/or omissions thus were also a direct and proximate cause of Plaintiffs' injuries and damages, as alleged herein.

114.     As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs incurred expenses for funeral and burial expenses in an amount to be proved.

115.     As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs suffered the loss of the services, society, care, and protection of the decedent, as well as the loss of the present value of her future services to her daughters.  Plaintiffs are further entitled to recover prejudgment interest.

116.     Plaintiff Estate of Sandra Vela is entitled to recover punitive damages against individual Defendants who, with conscious regard of Sandra Vela's rights, failed to provide her with health care services meeting the professional standard of practice, and/or failed to adhere to legal and professional standards of correctional supervision and administration.

117.     The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive.  As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## SEVENTH CLAIM FOR RELIEF

### Negligence

### (Survival Actions – California State Law)

### (Against ALL Defendants)

118.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 117 as though fully set forth herein.

119.     Defendants failed to comply with professional standards in the treatment, care, and supervision of Sandra Vela during her incarceration at the Jail.

Defendants' failures included but are not limited to: failing to provide timely and necessary medical and mental health treatment; failing to prescribe or provide appropriate and necessary medications and ensure compliance with those medications; failing to appropriately assess and evaluate suicide risk; prematurely removing Vela from suicide watch; placing Vela in an unsafe cell; failing to conduct welfare and safety checks at required intervals; and failing to provide immediate assistance to Vela when she was discovered hanging.

120.    Defendants also failed to appropriately supervise, review, and ensure the competence of provision of care and treatment to Sandra Vela by medical and custody staff, and failed to enact appropriate standards and procedures that would have prevented such harm to her.

121.    Together, Defendants acted negligently and improperly, breached their respective duties, and as a direct and proximate result, Plaintiffs suffered injuries and damages as alleged herein.

122.    The negligent conduct of Defendants was committed within the course and scope of their employment.

123.    The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive.  As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.    For compensatory, general and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.    For damages related to loss of familial relations as to Plaintiffs AnnaMarie Moreno and Bernadette Alverado;

3.    Funeral and burial expenses, and incidental expenses not yet fully

COMPLAINT FOR DAMAGES          -24-

ascertained;

4.      General damages, including damages for physical and emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma and suffering, the loss of the services, society, care and protection of the decedent, as well as the loss of financial support and contributions, loss of the present value of future services and contributions, and loss of economic security;

5.      Prejudgment interest;

6.      For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

7.      For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

8.      For restitution as the court deems just and proper;

9.      For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury in this action.


Dated: May 2, 2016                    Respectfully Submitted,

                                      RIFKIN LAW OFFICE

                                      HADSELL STORMER & RENICK LLP


                                      By: _*/s/ Lori Rifkin*_____
                                            Dan Stormer
                                            Lori Rifkin
                                            Joshua Piovia-Scott
                                            Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES            -25-