1
2
3
4 **UNITED STATES DISTRICT COURT**
5 **NORTHERN DISTRICT OF CALIFORNIA**
6 **SAN JOSE DIVISION**
7

8  ESTATE OF SANDRA VELA, et al.,

   Plaintiffs,

9

   v.

10

11 COUNTY OF MONTEREY, et al.,

   Defendants.

12

13

14

15

16

| | |
|---|---|
| | Case No. 16-cv-02375-BLF |
| | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND DENYING CFMG DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| | [Re: ECF 125, 126, 129] |

17  Two weeks after fifty-two year old Sandra Vela was booked into the Monterey County Jail

18 on a fifteen-year-old warrant, she committed suicide by hanging herself with a bed sheet. Ms.

19 Vela's daughters bring suit individually and on behalf of Ms. Vela's estate, asserting that jail

20 personnel were deliberately indifferent to Ms. Vela's serious medical and mental health needs in

21 violation of her federal constitutional rights and state law.

22  This order addresses three motions: (1) a motion for partial summary judgment by

23 Plaintiffs; (2) a motion for summary judgment by Monterey County and several of its officials and

24 employees (collectively, "County Defendants"); and (3) a motion for summary judgment by

25 California Forensic Medical Group ("CFMG") and its president Dr. Taylor Fithian (collectively,

26 "CFMG Defendants"). For the reasons discussed below, Plaintiffs' motion is GRANTED IN

27 PART AND DENIED IN PART; the County Defendants' motion is DENIED; and the CFMG

28 Defendants' motion is DENIED.

# I.   BACKGROUND[1]

Sandra Vela was booked into the Monterey County Jail on March 11, 2015, following her arrest on a 15-year-old warrant for forgery and embezzlement.  At jail intake, she reported medical issues including seizures, diabetes, psychiatric problems, brain cancer,[2] depression, and a history of suicide attempts.  Ms. Vela was housed in a single cell in R-pod, a lockdown unit for female inmates.  Many of the cells in R-pod contained hanging points which could be used by inmates to commit suicide.

At approximately 10:00 a.m. on March 20, 2015, Ms. Vela told a jail staff member, Deputy Nicholas Lopez, that she wanted to kill herself.  Ms. Vela was transferred to a safety cell and placed on suicide watch.  At approximately 2:00 p.m. the same day, Ms. Vela was seen by Dr. Taylor Fithian, the jail psychiatrist and president of CFMG, the private corporation hired by Monterey County to provide medical, mental health, and dental services to jail inmates.  Dr. Fithian assessed Ms. Vela while standing in the door of her safety cell.  Dr. Fithian determined that Ms. Vela was stable and discharged her from suicide watch.  He gave no orders regarding her cell placement and thus she was transferred back to R-pod with full property, including clothing and bedding.

Jail policy required deputies to conduct hourly welfare checks of inmates in lockdown pods such as R-pod.  The deputies look for signs of life, and for signs of observable distress or trauma.  If a deputy cannot identify signs of life by looking into the cell, the deputy must knock on the window, call out, or otherwise elicit a response.

Deputies Nora Quintero and Barbara Fulkerson shared the overnight responsibility for welfare checks for R-pod on the night of March 23, 2015 and into the morning hours of March 24, 2015.  Deputy Quintero completed a welfare check of R-pod at 12:04 a.m. on March 24, 2015.  Deputy Fulkerson initialed the log to indicate that she had performed a welfare check of R-pod at

---

[1] The background facts are undisputed unless otherwise noted.

[2] As discussed below, although Ms. Vela self-reported brain cancer to jail staff, the coroner's report indicated that she actually had a different condition, "pseudotumor cerebri," which presents as a tumor but is a buildup of cerebrospinal fluid. Coroner's Report at 3, Exh. 151 to Rifkin Decl., ECF 125-1.

1:06 a.m. However, Deputy Fulkerson did not actually perform the 1:00 a.m. welfare check. Deputy Quintero performed the next hourly check, and at approximately 2:05 a.m. she looked through the window of Ms. Vela's cell to observe Ms. Vela in a sitting position next to her bunk with one end of a sheet wrapped around her neck and the other end tied to the bunk bed rail. Deputy Quintero entered the cell and untied the bedsheet from the bunk bed rail, pulled Ms. Vela outside the cell, and performed CPR. Deputy Fulkerson arrived at the scene, followed by emergency responders. Ms. Vela was pronounced dead at 2:28 a.m.

Ms. Vela's daughters, Annamarie Moreno and Bernadette Alverado, filed this action on May 2, 2016. They filed the operative first amended complaint ("FAC") on September 28, 2016, asserting the following claims: (1) a § 1983[3] claim for deliberate indifference to serious medical and mental health needs in violation of the Fourteenth Amendment ; (2) a § 1983 claim for failure to protect from harm in violation of the Fourteenth Amendment; (3) a § 1983 claim for deprivation of substantive due process in violation of the First and Fourteenth Amendments, causing loss of parent/child relationship; (4) a state law claim for failure to furnish/summon medical care; (5) a state law claim for negligent supervision, training, hiring, and retention; (6) a state law claim for wrongful death under California Code of Civil Procedure § 377.60; and (7) a state law claim for negligence. *See* FAC, ECF 54. The FAC names as defendants Monterey County, several jail officials and employees, CFMG, Dr. Fithian, and Dr. Eliud Garcia, who was CFMG's on-site medical director at the time of Ms. Vela's death.

Plaintiffs voluntarily dismissed Claims 4, 5, and 7, and Defendants Erika Kaye and Eliud Garcia. *See* Stipulation and Order ECF 155; Stipulation of Voluntary Dismissal, ECF 119. Litigation of Plaintiffs' claims against Deputy Barbara Fulkerson is stayed pursuant to 11 U.S.C. § 362, pending resolution of Deputy Fulkerson's bankruptcy case. *See* Order Staying Litigation, ECF 62. This order addresses the remaining parties' motions for summary judgment as to all claims not previously dismissed, that is, Claims 1, 2, 3, and 6.

_____

[3] 42 U.S.C. § 1983.

## II. LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Id.* "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

Plaintiffs assert claims against Monterey County, Sheriff Steve Bernal, former Sheriff Scott Miller, Captain James Bass, Commander John Mihu, Sergeant Carol White, Deputy Nora Quintero, CFMG, and Dr. Fithian for deliberate indifference to Ms. Vela's serious medical and mental health needs in violation of the Fourteenth Amendment (Claim 1), failure to protect from harm in violation of the Fourteenth Amendment (Claim 2), deprivation of the parent/child relationship in violation of the First and Fourteenth Amendments (Claim 3), and wrongful death under California Civil Procedure Code § 377.60 (Claim 6).

Plaintiffs seek partial summary judgment against Monterey County, CFMG, and Dr. Fithian as to liability with respect to Claims 1, 2, and 3. The County Defendants and the CFMG Defendants seek summary judgment as to Claims 1, 2, 3, and 6.

United States District Court
Northern District of California

### A.    Failure to Provide Medical Care (Claim 1) and Failure to Protect (Claim 2)

The due process clause of the Fourteenth Amendment guarantees that pretrial detainees receive constitutionally adequate medical and mental health care.  *Conn v. City of Reno*, 591 F.3d 1081, 1094 (9th Cir. 2010), cert. granted, judgment vacated sub nom. *City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), and opinion reinstated, 658 F.3d 897 (9th Cir. 2011).  That right requires treatment of a "serious" medical need, which exists when "failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain."  *Id.* at 1095 (internal quotation marks and citation omitted).  "A heightened suicide risk or an attempted suicide is a serious medical need."  *Id.*  Pretrial detainees also have a due process right to be protected from a substantial risk of serious harm.  *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016).

"[T]he Supreme Court has treated medical care claims substantially the same as other conditions of confinement violations including failure-to-protect claims," finding "no significant distinction between claims alleging inadequate medical care and those alleging inadequate conditions of confinement."  *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018) (quotation marks and citation omitted).  Thus claims for failure to provide medical care and failure to protect are evaluated under the same legal standards.  *Id. Gordon*, 888 F.3d at 1124 (The Ninth Circuit has "long analyzed claims that government officials failed to address pretrial detainees' medical needs using the same standard as cases alleging that officials failed to protect pretrial detainees in some other way.").  The standards applicable to individual defendants and to entity defendants are set forth below.

#### 1.    Legal Standard for Individual Defendants

The elements of a pretrial detainee's Fourteenth Amendment claim against an individual officer for deprivation of adequate medical care or failure to protect from harm are:  "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved –

making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125 (medical care claim); *see also Castro*, 833 F.3d at 1071 (failure to protect claim). "With respect to the third element, the defendant's conduct must be objectively unreasonable." *Gordon*, 888 F.3d at 1125. (internal quotation marks and citation omitted).

### 2.    Legal Standard for Entity Defendants under *Monell*

A county or other local governing body may be liable for a constitutional deprivation where the plaintiff can "satisfy the requirements for municipality liability established by *Monell* and its progeny." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247 (9th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978)). To satisfy those requirements, a detainee must (1) show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation," and (2) "demonstrate that the custom or policy was adhered to with deliberate indifference to the constitutional rights of the jail's inhabitants." *Castro*, 833 F.3d at 1075-76. The deliberate indifference standard for municipalities is an objective standard. *Castro*, 833 F.3d at 1076. "[A]n objective standard applies to municipalities 'for the practical reason that government entities, unlike individuals, do not themselves have states of mind.'" *Mendiola-Martinez*, 836 F.3d at 1248 (quoting *Castro*, 833 F.3d at 1076). "This *Castro* objective standard is satisfied when 'a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission [or act] is substantially certain to result in the violation of the constitutional rights of their citizens.'" *Id.* at 1248-49 (quoting *Castro*, 833 F.3d at 1076) (alteration in original).

### 3.    Plaintiffs' Motion

Plaintiffs seek partial summary judgment as to the liability of the County, CFMG, and Dr. Fithian on Claim 1 (failure to provide medical care) and Claim 2 (failure to protect).

### a.    County

Under the authorities discussed above, Plaintiffs must prove the following elements in order to establish liability against the County: (1) the County had a policy or custom which led to a deprivation of Ms. Vela's constitutional rights to adequate medical care and/or protection from

harm, and (2) the policy or custom was implemented with deliberate indifference to the constitutional rights of the jail's inhabitants. "The custom or policy must be a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Castro*, 833 F.3d at 1075 (quotation marks and citation omitted).

Plaintiffs identify four policies or customs which they contend give rise to the County's liability under *Monell*: (1) failure to remediate suicide hazards in lockdown cells; (2) failure to ensure adequate monitoring of inmates in R-pod; (3) discharge of at-risk inmates from suicide watch to lockdown units containing hanging points with full property, including bedsheets; and (4) failure to ensure that CFMG provided adequate care to inmates. In the Court's view, the first and third of Plaintiffs' identified policies properly are considered together as a single policy or custom with respect to the County's placement of inmates with a history of suicidality following release from suicide watch. The Court addresses that policy or custom first, then addresses the second and fourth policies identified by Plaintiffs.

### i. Placement of Inmates with a History of Suicidality following Release from Suicide Watch

<u>Policy or Custom Causing Constitutional Deprivation</u>

Taken together, the conduct described in (1) and (3) above amount to the County's policy or custom regarding placement of inmates with a history of suicidality following their release from suicide watch. In *Castro*, the Ninth Circuit held that a collection of routine practices regarding placement of intoxicated inmates in sobering cells amounted to a custom or policy actionable under *Monell*. In that case, two individuals were placed in the same "sobering cell" at the West Hollywood police station. *Castro*, 833 F.3d at 1065. The plaintiff, Castro, had been arrested on a misdemeanor charge of public drunkenness, while the other individual, Gonzalez, had been arrested on a felony charge after he shattered a glass door with his fist at a nightclub. *Id.* The cell did not meet applicable building code requirements for "maximum visual supervision" and audio-monitoring. *Id.* The sobering cell nonetheless was used routinely, and inmates housed in the cell were checked only sporadically. *Id.* at 1064. Within hours of their co-confinement, Gonzalez

severely beat and injured Castro. *Id.* Castro's attempts to seek help by banging on the window in the cell door went unheeded by jail staff. *Id.* at 1065. Castro sued the County of Los Angeles, the Los Angeles Sheriff's Department, and individual jail personnel, claiming that they violated his constitutional rights by housing him in the sobering cell with Gonzalez and failing to maintain appropriate supervision of the cell. *Id.* A jury returned a verdict for Castro on all counts and awarded him more than $2 million in damages. *Id.* at 1066. The district denied the defendants' motion for judgment as a matter of law, and the defendants appealed. *Id.*

On appeal, the defendants argued that the architecture of the West Hollywood police station's sobering cell could not be a policy, custom, or practice giving rise to municipal liability. *Castro*, 833 F.3d at 1075. The Ninth Circuit concluded that it did not need to decide that question because "the design of the cell is only the backdrop for the entity defendants' policy or custom," which was comprised of the County's "deliberate choices *in light of* the poor design and location of the sobering cell." *Id.* The Ninth Circuit noted that the County had a custom of housing intoxicated inmates in sobering cells that contained inadequate monitoring even though there were other cells in which intoxicated inmates could be detained, and the County chose to check on inmates in the sobering cell only every 30 minutes. *Id.* The court found that "[t]hese routine practices were consciously designed and, together, they amount to a custom or policy." The Ninth Circuit summarized the custom or policy as "to use a sobering cell that lacked adequate audio surveillance to detain more than one belligerent drunk person while checking the cell visually only once every half hour." *Id.* The Ninth Circuit nonetheless suggested that the cell's architecture might qualify as a custom or policy, noting "that every construction project requires deliberate choices in design and implementation." *Id.* at n.8.

In the present case, Plaintiffs present evidence that the County had several routine practices which together amounted to a custom or policy regarding placement of inmates with a history of suicidality following their release from suicide watch. Importantly, the County was aware of suicide hazards in the jail lockdown units prior to Ms. Vela's death but chose not to remediate those hazards. Among Plaintiff's evidence on that point is the 2011 Jail Needs Assessment Report stating that "older design of cells and dormitories constructed prior to 1993 does not meet today's

8

minimum standards for acceptable detention facilities. . . .  Suicide hazard elimination is not as stringent as it should be to prevent self-harm and the attendant liability."  Jail Needs Assessment Report at 9, Exh. 7 to Rifkin Decl., ECF 125-1; Bass Dep. 26:2-8, Exh. B to Rifkin Decl., ECF 125-2.  Dr. Hayward's 2014 Report provided even more specific notice, identifying bunk bed frames to which ligatures could be tied as suicide hazards.  Hayward Report at 18-19, Ex. 86 to Rifkin Decl., ECF 125-1.  It is undisputed that the County was aware that bunk bed frames had been identified as suicide hazards.  Although the County's command staff began discussing structural changes to eliminate suicide hazards in the first half of 2014, the County did not take any action to do so until August 2016.   Bass Dep. 32:22-33:25, Exh. B to Rifkin Decl., ECF 125-2.  When the County finally got around to addressing the structural suicide hazards, it was able to eliminate the bed frame hanging points in R-pod without any major construction by using metal bolts and sealant to seal gaps between the beds and the walls.  *Id.* 38:1-18; Job Order Contracts and Photographs, Exh. 9 to Rifkin Decl., ECF 125-1.

Plaintiffs also present evidence that even if it chose not to remediate the suicide hazards in the lockdown cells, the County could have taken other measures to protect inmates upon their release from suicide watch.  Dr. Hayward's 2014 Report suggests that inmates at risk for suicide, but not so acutely suicidal as to warrant placement in a safety cell, could be placed in lockdown cells with safety gowns and safety blankets instead of with full property including regular bedding and clothing.  Hayward Report at 16, Ex. 86 to Rifkin Decl., ECF 125-1.  The report also suggests that the County could house such inmates in open dormitories where the presence of other inmates would dramatically reduce the risk of suicide.  *Id.*

As in *Castro*, this Court concludes that "[t]hese routine practices were consciously designed and, together, they amount to a custom or policy."  *See Castro*, 833 F.3d at 1075.  That custom or policy was to place inmates with a history of suicidality in lockdown cells containing known suicide hazards which included hanging points, while allowing the inmates full property including bedding and clothing, immediately following the inmates' discharge from suicide watch.

Plaintiffs present evidence showing that the County's policy or custom deprived Ms. Vela of her constitutional right to be protected from a substantial risk of serious harm, in this case

suicide.  During the jail intake process, Ms. Vela reported a history of suicide attempts and depression, current feelings of depression, psychiatric problems, and other medical issues including diabetes and cancer.  Monterey County Jail Medical Intake Questionnaire, Exh. 45 to Rifkin Decl., ECF 125-1.  Ms. Vela also reported that she had suffered from brain cancer for 20 years and had a shunt in her head.[4]  Intake Triage Assessment, Exh. 45 to Rifkin Decl., ECF 125-1.  The County's expert, Leonard Vare, testified that Ms. Vela was housed in a single cell in R-pod, a lockdown unit, because she had auditory hallucinations and so was not compatible with other inmates.  Vare Dep. 17:21-18:2, Exh. Y to Rifkin Decl., ECF 125-3.  On March 20, 2015, Ms. Vela told Deputy Lopez that she wanted to kill herself and that she had terminal cancer.  Lopez Dep. 17:6-18:7, Exh. M to Rifkin Decl., ECF 125-3.  Deputy Lopez had Ms. Vela moved to a safety cell and placed on suicide watch.  *Id.* 54:24-55:1.  Deputy Lopez documented the reason for the safety cell placement on a Lockdown/Inmate Movement Form, indicating that Ms. Vela had stated that she has terminal cancer and wanted to kill herself.  *Id.* 60:15-61:16; Lockdown/Inmate Movement Form, Exh. 49 to Rifkin Decl. ECF 125-1.

The above evidence is sufficient to meet Plaintiffs' initial burden of showing that the County had a policy or custom which deprived Ms. Vela of a constitutional right.  The County could have remediated the suicide risks in the R-pod cells before returning Ms. Vela there upon discharge from suicide watch.  It could have returned Ms. Vela to her cell in R-pod without full property, including the sheet she used to hang herself, and instead provided her with a safety gown and safety bedding.  The County could have housed Ms. Vela elsewhere after her discharge from suicide watch.  Any reasonable juror presented with this evidence would find a direct and causal link between the County's policy or custom to place inmates with a history of suicidality in lockdown cells containing known suicide hazards which included hanging points, while allowing the inmates full property including bedding and clothing, immediately following the inmates' discharge from suicide watch, and Ms. Vela's death.  The burden thus shifts to the County to

---

[4] Although Ms. Vela reported that she had brain cancer, the coroner reported that her actual diagnosis was "pseudotumor cerebri," a condition that presents as a tumor but actually is a buildup of cerebrospinal fluid. Coroner's Report at 3, Exh. 151 to Rifkin Decl., ECF 125-1. A shunt had been placed in Ms. Vela's brain to relieve pressure from the condition.  *Id.* at 3-4.

demonstrate the existence of a triable issue of material fact.

The County does not identify any evidence to dispute Plaintiffs' showing on the existence of a policy or custom causing a constitutional deprivation. Indeed, the County's scant 9-page opposition brief does not specifically address any of the policies identified by Plaintiffs. Instead, the County argues in conclusory fashion, without citation to any evidence, that "Plaintiffs' motion appears completely deficient" because "[t]here simply is no evidence that any alleged Constitutional violation was the actual and proximate cause of Ms. Vela's suicide." County's Opp. at 4, ECF 134. "[A] district court has no independent duty to scour the record in search of a genuine issue of triable fact, and may rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010) (quotation marks and citations omitted).[5]

To the extent the County points the Court to any evidence in opposition to Plaintiffs' motion, it appears to be intended to show that the County was not deliberately indifferent to Ms. Vela's medical needs. Deliberate indifference is discussed below.

Deliberate Indifference

The objective deliberate indifference applicable to entity defendants "is satisfied when a § 1983 plaintiff can establish that the facts available to [ ] policymakers put them on actual or constructive notice that the particular omission [or act] is substantially certain to result in the violation of the constitutional rights of their citizens." *Mendiola-Martinez*, 836 F.3d at 1248-49 (quotation marks and citation omitted). Plaintiffs point to the testimony of Captain Bass, who was produced for deposition as the County's person most knowledgeable under Federal Rule of Civil Procedure 30(b)(6), that "[a]s of March 2015, command staff at the jail were aware that there were potential attachment points for ligatures in the cells in the R-pod." Bass Dep. 31:19-24, Exh. B to Rifkin Decl., ECF 125-2. Command staff were aware that sheets or other material could be attached to the hanging points in R-pod for the purpose of suicide. *Id.* 32:1-6. Command staff also were aware that County practice was to return inmates released from suicide watch back to

---

[5] The Court also has reviewed the County Defendants' motion for summary judgment and finds that nothing cited there would provide evidence of disputed facts to defeat Plaintiffs' motion.

their housing units, including R-pod, with full property such as clothing, sheets and bedding. *Id.* 31:1-11. Finally, the County was aware that in the years prior to Vela's suicide in 2015, there were multiple suicides at the jail. *Id.* 32:8-20. The Court concludes that any reasonable juror would find that these facts put the County on notice that its policy or custom to place inmates with a history of suicidality in lockdown cells containing known suicide hazards which included hanging points, while allowing the inmates full property including bedding and clothing, immediately following the inmates' discharge from suicide watch, was substantially certain to lead to more inmate suicide attempts. Thus Plaintiffs' showing is sufficient to meet their initial burden of showing that the policy or custom was implemented by the County with deliberate indifference to the constitutional rights of jail inmates to protection from substantial risk of harm. The burden thus shifts to the County to demonstrate the existence of a triable issue of material fact.

In opposition to Plaintiffs' motion, the County argues that it did not have notice of a substantial risk of harm because there had not been a female suicide at the Jail for more than 35 years. *See* Fithian Dep. 54:1-4, Exh. A to Philippi Decl., ECF 134-1. However, the County presents no academic research or expert opinion suggesting that female suicide rates in custody are to be interpreted differently than male suicide rates. Nor does the County present any evidence that it delayed remediation of identified hanging points in the women's jail cells due to a belief that risk of suicide by female inmates was insubstantial.

The County also argues that it had no knowledge of prior suicide attempts by Ms. Vela, and that in fact Ms. Vela was stable according to Dr. Fithian. *See* Fithian Dep. 46:17-48:2, Exh. A to Philippi Decl., ECF 134-1. That argument misses the point. Plaintiffs need not show that the County had subjective knowledge that Ms. Vela, specifically, was a risk, which in fact they have done by pointing to Ms. Vela's jail intake form and statement to Deputy Lopez that she wanted to kill herself. The relevant question is whether the facts available to the County's policymakers put them on actual or constructive notice that the policy or custom was substantially certain to result in harm to inmates. *See Castro*, 833 F.3d at 1076-77; *see also Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1077-78 (9th Cir. 2013) ("The appropriate inquiry was whether the Supervisory Defendants were aware that removing all floor officers from Building 8 for over three

and a half hours would pose a substantial risk of serious harm to someone in St. Jovite's situation, not simply whether they were subjectively aware of St. Jovite's specific medical needs."). If so, the applicable objective deliberate indifference is satisfied. *See Castro*, 833 F.3d at 1076-77*; Lemire*, 726 F.3d at 1077-78.

The County appears to argue that it was justified in relying on Dr. Fithian and CFMG with respect to the decision to release Ms. Vela from suicide watch. While that may be true, the County rather than the CFMG Defendants had the authority and the responsibility to eliminate the hanging points in R-pod, return Ms. Vela to R-pod without full property, or place Ms. Vela elsewhere. At the hearing, the County argued that the Hayward Report was completed May 30, 2014, only 10 months before Ms. Vela's suicide on March 24, 2015. Counsel suggested that 10 months was an insufficient amount of time to eliminate the hanging points. However, the County has presented no evidence to suggest that the repair was complicated, expensive, or time consuming. It appears that the repair – adding some metal bolts and sealant to close the gap between the bed rails and the walls – was cheap and quick. *See* Bass Dep. 38:1-18, Exh. B to Rifkin Decl., ECF 125-2; Job Order Contracts and Photographs, Exh. 9 to Rifkin Decl., ECF 125-1.

The Court concludes that on this record, no reasonable jury could find that the County was justified in placing inmates with a history of suicidality in the lockdown cells in question without effecting this simple fix to the known suicide risks.

In summary, Plaintiffs have submitted evidence establishing that the County had notice that its policy or custom to place inmates with a history of suicidality in lockdown cells containing known suicide hazards which included hanging points, while allowing the inmates full property including bedding and clothing, immediately following the inmates' discharge from suicide watch, posed a substantial risk of serious harm to inmates and that the County was deliberately indifferent to that risk. The County has failed to submit evidence creating a triable issue as to these material facts. Accordingly, Plaintiffs' motion for summary judgment on liability with respect to Claims 1 and 2 is GRANTED to the extent the claims are based on the County's policy or custom regarding placement of inmates with a history of suicidality upon discharge from suicide watch. *See Castro*,

833 F.3d at 1078 (affirming judgment against entity defendants based on evidence that "the entity defendants had notice that their customs or policies posed a substantial risk of serious harm to persons detained in the West Hollywood sobering cell and were deliberately indifferent to that risk").

### ii.     Failure to Ensure Adequate Monitoring in R-pod

Plaintiffs also assert liability against the County based on the County's alleged policy or custom of failing to ensure monitoring of R-pod.  However, the Court concludes that Plaintiffs have failed to establish a direct causal link between the asserted policy and the deprivation of Ms. Vela's constitutional rights.  While Plaintiffs present substantial evidence that jail supervisors failed to enforce jail policy requiring hourly welfare checks in R-pod despite knowledge that deputies routinely skipped those checks, *see* Bass Dep. 103:7-19, ECF 125-2; Mihu Dep. 66:4-20, ECF 125-3, Plaintiffs present no evidence as to *when* Ms. Vela hanged herself.  If it was immediately after the 12:04 a.m. welfare check performed by Deputy Quintero, such that Ms. Vela was deceased by the time Deputy Fulkerson should have done the next check at approximately 1:00 a.m., there would be no causal connection between the County's failure to ensure monitoring of R-pod and Ms. Vela's death.  In other words, Ms. Vela would have been dead whether or not the 1:00 a.m. welfare check occurred.  "In order to establish municipal liability, a plaintiff must show that a 'policy or custom' led to the plaintiff's injury."  *Castro*, 833 F.3d at 1073.

Accordingly, Plaintiffs' motion for summary judgment with respect to Claims 1 and 2 is DENIED to the extent the claims are based on the County's alleged policy or custom of failing to ensure monitoring of R-pod.

### iii.    Failure to Ensure CFMG Provided Adequate Care

Finally, Plaintiffs assert liability against the County based on its policy or custom of failing to monitor CFMG to ensure that CFMG provided adequate medical and mental health care to inmates.  *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) ("[A] State cannot avoid its obligations under federal law by contracting with a third party to perform its functions.").  However, the Court concludes that there are disputed issues as to whether the asserted policy or custom led to a deprivation of Ms. Vela's constitutional rights.  Plaintiffs

present evidence that no County staff reviewed the mental health treatment CFMG provided, even after suicides occurred. *See* Miller Dep. 57:24-60:10, Exh. O to Rifkin Decl., ECF 125-3; Bass Dep. 25:16-22, Exh. B to Rifkin Decl., ECF 125-2. However, the County's failure to monitor CFMG could not give rise to liability unless that failure led to a deprivation of Ms. Vela's constitutional rights. There is a factual dispute whether CFMG met the standard of care, created in part by the report of CFMG's psychiatry expert, Jason Roof, M.D. *See* Roof Report at 2, Exh. E to Stoddard Decl., ECF 135-1. Dr. Roof opines that during Ms. Vela's detention at the jail, she "received timely and comprehensive mental health care which met the applicable standard of care," that "CFMG had appropriate policies, procedures, and practices in place," and that "Ms. Vela's suicide was not caused, in medical probability, by the medical care and treatment provided by CFMG and its medical staff." *Id.* If CFMG met the standard of care, there would be no causal connection between the County's asserted failure to monitor CFMG and injury to Ms. Vela.

Accordingly, Plaintiffs' motion for summary judgment with respect to Claims 1 and 2 is DENIED to the extent the claims are based on the County's alleged policy or custom of failing to ensure that CFMG provided adequate medical and mental health care.

### b. CFMG and Dr. Fithian

Plaintiffs have marshalled an enormous amount of evidence regarding CFMG's policies in general and Dr. Fithian's treatment of Ms. Vela in particular. According to Plaintiffs, this evidence proves that CFMG provided Ms. Vela with constitutionally deficient mental health care by failing to implement policies to ensure adequate suicide risk assessment and appropriate recommendations regarding housing, property, and monitoring upon discharge from suicide watch. Plaintiffs also contend that Dr. Fithian is personally liable under the Fourteenth Amendment for discharging Ms. Vela from suicide watch without adequately assessing the risk factors for suicide and for discharging her to a dangerous environment without taking appropriate precautions.

Disputed issues regarding the adequacy of CFMG's policy and Dr. Fithian's treatment of Ms. Vela preclude summary judgment. In order to establish *Monell* liability against an entity defendant such as CFMG, Plaintiffs must (1) show "a direct causal link between a municipal

policy or custom and the alleged constitutional deprivation," and (2) "demonstrate that the custom or policy was adhered to with deliberate indifference to the constitutional rights of the jail's inhabitants." *Castro*, 833 F.3d at 1075-76. Similarly, to establish liability against Dr. Fithian for deprivation of adequate medical care or failure to protect from harm, Plaintiffs must establish "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125 (medical care claim); *see also Castro*, 833 F.3d at 1071 (failure to protect claim). Neither of these standards can be met if CFMG and Dr. Fithian met the standard of care in their treatment of Ms. Vela.

CFMG and Dr. Fithian present expert opinion and other evidence that CFMG's suicide prevention policy was adequate and that Dr. Fithian's treatment of Ms. Vela met the standard of care. Dr. Fithian's expert, Dr. Roof, has prepared a report concluding among other things that "CFMG had appropriate policies, procedures, and practices in place," and that "Ms. Vela's suicide was not caused, in medical probability, by the medical care and treatment provided by CFMG and its medical staff." *See* Roof Report, Exh. E to Stoddard Decl., ECF 135-1. Dr. Roof also states that Ms. Vela was continuously and appropriately assessed for suicide risk. *Id.* Dr. Fithian presents evidence that Ms. Vela was seen 21 times by medical professionals from the time she was discharged from suicide watch on March 20, 2015 to the time she committed suicide on March 24, 2015. *See* Chiang Report, Exh. E to Stoddard Decl., ECF 135-1. Based on a review of those professionals' documentation, retained expert Dr. C. Hsien Chiang opines that none of the medical professionals indicated any concerns regarding risk of suicide. *Id.*

The Court has highlighted only a fraction of the disputed facts illustrated by the parties' briefing. The Court does not intend to suggest that these are the only facts at issue with respect to Plaintiffs' claims against CFMG and Dr. Fithian. However, because the disputed facts identified above create triable issues as to the adequacy of the policies and care provided by CFMG and Dr.

16

Fithian, the Court DENIES Plaintiffs' motion for summary judgment against the CFMG Defendants as to liability on Claims 1 and 2.

### 4. County Defendants' Motion

The County Defendants seek summary judgment as to all claims asserted against them, including Claims 1 and 2. Unfortunately, while the County Defendants submitted a great deal of evidence, much of it is untethered to the arguments presented in their briefs. Thus while the County Defendants assert that "Plaintiffs cannot demonstrate a specific policy or custom on the part of the County that was the 'moving force' behind Ms. Vela's unfortunate suicide," they do not direct the Court to any evidence to support that assertion. *See* County Defs.' Motion at 12, ECF 129. Moreover, the County's motion fails to engage with the critical facts upon which Plaintiffs' deliberate indifferent claims are based. For example, the County's motion fails to address Plaintiffs' assertions that the County failed to remediate known suicide hazards in lockdown cells and routinely placed inmates with a history of suicidality in those cells, with full property. The County's motion likewise fails to address Plaintiffs' contention that that despite a written policy requiring hourly welfare checks, the County had an actual custom and practice of skipping welfare checks and that Deputy Fulkerson skipped the 1:00 a.m. welfare check the night Plaintiff died. The County's asserted conduct could support a claim that the County was deliberately indifferent to detainees' serious risk of suicide. *See Castro*, 833 F.3d at 1076. The County's failure to address that conduct mandates denial of their motion.

The County Defendants contend that they are entitled to summary judgment based on qualified immunity. As an initial matter, qualified immunity is not available to entity defendants such as the County. *Mendiola-Martinez*, 836 F.3d at 1250 ("But as a threshold matter, Maricopa County is not eligible for qualified immunity because counties do not enjoy immunity from suit – either absolute or qualified – under § 1983." (quotation marks and citation omitted)).

"Qualified immunity protects government officers 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether

1   qualified immunity applies, the Court asks (1) whether the alleged misconduct violated a

2   constitutional right and (2) whether the right was clearly established at the time of the alleged

3   misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2008); *Maxwell*, 708 F.3d at 1082. The

4   Court may consider these two questions in any order. *Id.* When this test is properly applied, it

5   protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-*

6   *Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks and citation omitted).

7       The County Defendants misstate this test, arguing incorrectly that "[o]n an assertion of

8   qualified immunity, a two-part test applies: first, the court determines whether the law that

9   governs the official's conduct was clearly established; second, the court considers whether a

10   reasonable officer could have believed the conduct was lawful." County Defs.' Motion at 12, ECF

11   129. It appears that the County Defendants have broken the second prong of the qualified

12   immunity inquiry (whether the right was clearly established) into a two-part test while ignoring

13   the first prong of the inquiry (whether the alleged misconduct violated a constitutional right). The

14   County Defendants then argue that under this misstated test, they are entitled to qualified

15   immunity because "there is no clearly established law requiring custody deputies to summon

16   additional mental health care when an inmate housed in an administrative segregation cell is being

17   assessed by mental health staff on a regular basis, and the deputies check the inmate on a regular

18   basis." County Defs.' Motion at 14, ECF 129. However, the County Defendants do not fairly

19   articulate Plaintiffs' claims. As discussed above, Plaintiffs dispute whether Ms. Vela was assessed

20   by mental health staff on a regular basis and whether Ms. Vela was checked by deputies on a

21   regular basis.

22       The County Defendants also assert, based on *Gordon*, that prior to 2018 custody officers

23   were entitled to rely on their "subjective" reasonable knowledge regarding inmates' medical

24   needs. County Defs.' Opp. at 14, ECF 129. Thus, they argue, "qualified immunity shields each

25   Moving Defendant from liability if a similarly-situated law enforcement officer could have

26   reasonably believed the actions taken were legal in light of clearly established law and the

27   information possessed at the time." *Id.* The County Defendants conclude that under this rationale,

28   "qualified immunity shields defendant Bernal, Mihu, Bass, Kaye, White and Quintero from

18

liability on all federal claims asserted." *Id.*

In the Court's view, *Gordon* merely clarifies that the test for deliberate indifference under the Fourteenth Amendment is an objective one. It did not establish or expand any constitutional right, and therefore is irrelevant to the "clearly established" prong of the qualified immunity analysis. *See Gordon*, 888 F.3d at 1125. Moreover, the County Defendants do not explain *what* conduct, performed by *which* Defendant, they believe is shielded by qualified immunity.

Because the County Defendants cite the wrong legal standard and fail to identify what conduct, by whom, they believe is shielded by the doctrine of qualified immunity, their motion is DENIED.

### 5. CFMG Defendants' Motion

The CFMG Defendants seek summary judgment with respect to Claims 1 and 2, arguing that Plaintiffs cannot establish that the CFMG Defendants were deliberately indifferent to Ms. Vela's serious mental health needs or failed to protect her from harm in violation of the Fourteenth Amendment. The CFMG Defendants' motion against Plaintiffs fails for the same reason that Plaintiffs' motion against CFMG fails – there are disputed facts as to the adequacy of CFMG's policies and procedures and as to the adequacy of the care that Dr. Fithian provided to Ms. Vela. As the opinions of the CFMG Defendants' experts were sufficient to defeat Plaintiffs' motion, the directly contrary opinions of Plaintiffs' forensic psychiatry expert, Dr. Patterson, are sufficient to defeat the CFMG Defendants' motion. *See* Patterson Report, Exh. 163 to Rifkin Decl., ECF 143-1. Dr. Patterson states as follows: "it is my opinion to a reasonable degree of medical certainty that the mental health care and treatment provided to Ms. Sandra Lee Vela while incarcerated in the Monterey County Adult Detention Facility was below the standards of care, negligent, directly contributed to her completed suicide, and demonstrated deliberate indifference to her mental health care needs." Patterson Report at 12, Exh. 163 to Rifkin Decl., ECF 143-1. Dr. Patterson provides numerous similar opinions, stating among other things that:

> It is my opinion to a reasonable degree of medical certainty that Ms. Sandra Lee
> Vela's death was both foreseeable in that she had alerted correctional staff of her
> acute suicidal ideation and her intent to kill herself, and the deputy responded by
> placing her on suicide watch appropriately, only to have that suicide watch
> discontinued and her return to the previous lockdown segregation status in a cell

alone without there being adequate assessment by mental health or medical staff as to her thinking at the time of stating she wanted to die or what had changed about her thinking that would cause the treating psychiatrist to remove her from a more safe environment, i.e., suicide resistant safety cell with orders for staggered q 15 minute observations. Further it is my opinion to a reasonable degree of medical certainty that Ms. Sandra Lee Vela's death by suicide was also preventable in that had mental health, medical, and custodial staff followed their own policies and procedures as well as the community standard for placing and maintaining any individual including Ms. Vela on suicide watch status until she had been properly assessed and all of the information that was readily available in the medical records in addition of information which may have been available through her previous treaters and family had been reviewed and considered as a part of her treatment planning and management. This did not occur and in my opinion to a reasonable degree of medical certainty ultimately resulted in Ms. Vela's completed suicide. It is further my opinion to a reasonable degree of medical certainty failures in the standards of care were the proximate cause of Sandra Vela's death by suicide on March 24, 2015.

Patterson Report at 17, Exh. 163 to Rifkin Decl., ECF 143-1.

Dr. Patterson's report creates triable issues as to the liability of CFMG and Dr. Fithian under the standards set forth in *Castro* and *Gordon*, respectively.

The CFMG Defendants argue that even if Plaintiffs were to establish the other elements of a deliberate indifference claim, Defendants' conduct was not the proximate cause of Ms. Vela's death because Deputy Fulkerson's failure to perform the 1:00 a.m. welfare check was an unforeseeable, superseding cause. In § 1983 actions, "[t]raditional tort law defines intervening causes that break the chain of proximate causation." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (citation omitted). A defendant's conduct is not the proximate cause of the plaintiff's injury "if another cause intervenes and supersedes his liability for the subsequent events." *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990). "However, foreseeable intervening causes . . . will not supersede the defendant's responsibility." *Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th Cir. 2009), vacated, 131 S. Ct. 1812 (2011), reinstated in part and vacated in part, 658 F.3d 897 (9th Cir. 2011) (internal quotation marks and citation omitted).

It is unclear on this record what, if any, effect Deputy Fulkerson's failure to perform the 1:00 a.m. welfare check had on Ms. Vela that night. Because time of death is unknown, Ms. Vela could have been dead well before 1:00 a.m., in which case Deputy Fulkerson's conduct could not be viewed as an intervening or superseding cause. The CFMG Defendants cite evidence that a first responder thought Ms. Vela was "cold to touch," meaning she had just passed away, versus

"cold dead for a while." Weighington Dep. 62:3-13, Exh. M to Stoddard Decl., ECF 126-15. While that evidence certainly could give rise to an inference that Ms. Vela died only shortly before she was found, it is not dispositive as to time of death. Accordingly, this Court cannot conclude as a matter of law that Deputy Fulkerson's conduct was a intervening or superseding cause of death.

Because the disputed facts identified above create triable issues as to the adequacy of the policies and care provided by CFMG and Dr. Fithian, the Court DENIES the CFMG Defendants' motion for summary judgment as to Claims 1 and 2. The Court has highlighted only those disputed facts that are critical to ruling on the motions. The Court does not purport to identify all disputed facts in this case.

**B.     Loss of Parent/Child Relationship (Claim 3)**

As to Claim 3, Plaintiffs seek summary judgment on liability against the County, CFMG, and Dr. Fithian. The County Defendants and the CFMG Defendants seek summary judgment in their favor as to Claim 3.

"The substantive due process right to family integrity or to familial association is well established." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). "A parent has a fundamental liberty interest in companionship with his or her child." *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985). The violation of the right to family integrity is subject to remedy under § 1983. *Id.* "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire*, 726 F.3d at 1075 (9th Cir. 2013). To amount to a violation of substantive due process, the harmful conduct must "shock the conscience" or "offend the community's sense of fair play and decency." *Rosenbaum*, 663 F.3d at 1079. "A prison official's deliberately indifferent conduct will generally 'shock the conscience' so as long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Lemire*, 726 F.3d at 1075 (internal quotation marks and citation omitted).

Claim 3 is based on Defendants' asserted deliberate indifference to Ms. Vela's serious medical needs, health and safety, and on Defendants' asserted conduct causing Ms. Vela's

wrongful death.  Because Plaintiffs are entitled to summary judgment on liability as to Claims 1 and 2 insofar as they are based on the County's policy to place inmates with a history of suicidality in lockdown cells containing known suicide hazards which included hanging points, while allowing the inmates full property including bedding and clothing, immediately following the inmates' discharge from suicide watch, Plaintiffs likewise are entitled to summary judgment on liability as to Claim 3 against the County.  Under the authorities cited above, County policymakers' deliberate indifference to the risk harm caused by the policy "shocks the conscience."  The Court therefore GRANTS Plaintiffs' motion for summary judgment on liability against the County as to Claim 3 on this basis.  Because triable issues exist as to all other asserted conduct upon which Claim 3 is based, the Court DENIES the parties' motions for summary judgment as to Claim 3 in all other respects.

### C.  Wrongful Death (Claim 6)

Plaintiff does not seek summary judgment as to Claim 6.  The County Defendants and the CFMG Defendants seek summary judgment as to this claim.

The elements of a wrongful death claim are: (1) a wrongful act or neglect that (2) causes (3) the death of another person.  *See* Cal. Civ. P. Code § 377.60; *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390 (1999).  The wrongful death claim may be based on Plaintiffs' claims that Defendants were deliberately indifferent to Ms. Vela's serious mental health needs and to her safety.  *See Villarreal v. Cty. of Monterey*, 254 F. Supp. 3d 1168, 1191 (N.D. Cal. 2017).  Alternatively, the wrongful death claim may be premised on "any kind of tortious act."  *Barrett v. Superior Court*, 222 Cal. App. 3d 1176, 1191 (1990).

The County Defendants fail to recognize that Plaintiffs' wrongful death claim may be grounded in deliberate indifference to safety or to other tortious acts, apparently assuming that it is grounded in failure to furnish or obtain medical care for a prisoner under California Government Code § 845.6.  The County Defendants argue that Plaintiffs cannot establish serious and obvious medical or mental health conditions as required under § 845.6 and therefore cannot establish liability for wrongful death.  This argument ignores the possibility that the wrongful death claim is based on deliberate indifference to safety/failure to protect from harm.  Accordingly, the County

Defendants have failed to demonstrate entitlement to summary judgment on Claim 6.

The CFMG Defendants assert that Plaintiffs' wrongful death claim is barred by the statute of limitations found in California Code of Civil Procedure § 340.5, applicable to claims against healthcare providers. The statute provides in relevant part that "[i]n an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." Cal. Civ. P. Code § 340.5. The CFMG Defendants argue that under this statute, any claim had to be filed within one year of Ms. Vela's death, or by March 24, 2016, to be timely. Because this action was not filed until May 2, 2016, the CFMG Defendants assert that it cannot be maintained. That argument is without merit. Plaintiffs' wrongful death claim is not a claim of professional negligence and therefore § 340.5 does not apply. Plaintiffs' wrongful death claim arises under California Code of Civil Procedure 377.60 and is subject to a two-year limitations period under California Code of Civil Procedure 335.1.

The CFMG Defendants also argue that Plaintiffs' wrongful death claim is barred because Plaintiffs did not file a Notice of Intent pursuant to California Code of Civil Procedure § 364, under which "[n]o action based upon the health care provider's professional negligence may be commenced unless the defendant has been given at least 90 days' prior notice of the intention to commence the action." Again, Plaintiffs' wrongful death claim is not a claim for professional negligence.

Accordingly, the Court DENIES Defendants' motions as to Claim 6.

## V. ORDER

(1)     With respect to Plaintiffs' motions for partial summary judgment,

    (a)     Plaintiffs' motion for partial summary judgment against the County is GRANTED on Claims 1, 2, and 3, insofar as those claims are based on the County's policy or custom to place inmates with a history of suicidality in lockdown cells containing known suicide hazards which included hanging points, while allowing the inmates full property including bedding and

clothing, immediately following the inmates' discharge from suicide watch.

Plaintiffs' motion against the County otherwise is DENIED.

    (b)   Plaintiffs' motion for partial summary judgment against CFMG is DENIED.

    (c)   Plaintiffs' motion for partial summary judgment against Dr. Fithian is DENIED.

(2)   The County Defendants' motion for summary judgment is DENIED.

(3)   The CFMG Defendants' motion for summary judgment is DENIED.

Dated: August 27, 2018

_____
BETH LABSON FREEMAN
United States District Judge